Good morning, Your Honors. May it please the Court, Ted Atkinson for the appellants in this matter. If I have time remaining, I'd like to reserve three minutes for rebuttal. Okay. Watch the clock. Will do. Thank you, Your Honor. This case presents a statutory and constitutional interpretation question with regard to whether the government may continue to detain two distinct and specially treated categories of aliens under the Constitution for more than six months without a bond hearing before an immigration judge. The district court's order, which was accompanied without any opinion or findings of fact to conclusions of law in violation of Rule 52A, imposes a six-month rule, a blanket, one-size-fits-all rule that applies to every alien within these two distinct groups of aliens without regard to their factual circumstances and in a way that is irrebuttable by the government at any point. That is improper. All the district court did was require a bond hearing after six months. That's correct, Your Honor. The court essentially found, although we do not know the basis for the decision Let's stop criticizing the judge. Well, I'm not criticizing. I'm merely pointing out that the We understand. Okay. But the imposition of a six-month rule, the creation of a six-month rule has to be done if it is required by due process. And what the Supreme Court has said for decades with respect to arriving aliens and following the creation of the mandatory detention statute of 1226C in Des Moines is that these two groups of aliens implicate certain compelling congressional interests that allow their detention during the pendency of their removal proceedings. And that case law with respect to arriving aliens, decades-old case law and the court's decision in Des Moines teach that due process does not require a bond hearing for the detention of these aliens during the pendency of their removal proceedings and certainly not at an arbitrarily identified six-month point without regard to the facts and circumstances of any individual case. I think it is important and, in fact, it is critical for this court to understand and to review carefully the case law and the constitutional jurisprudence. I thought the whole principle of constitutional avoidance militator just interpreting this statute as to require the bond hearing is to interpret the statute as to not require a prolonged detention. There are two responses to that, Judge Wardlaw. First, that interpretation, the court may only use that as a tool of statutory construction when bumping up against a constitutional concern if there is first and foremost a constitutional concern. Second, even if there is a constitutional concern raised by prolonged detention under these two statutes, the constitutional avoidance doctrine cannot be applied where the statutes are first unambiguous and, second, where any reading of a bond hearing requirement into those statutes would conflict with Congress's clear intent. Now, with respect to 1226C, we have both clear, unambiguous language identifying that criminal aliens, certain criminal aliens in certain enumerated categories of serious criminal offenses must be detained. That is an exception. 1226C is an exception to the discretionary detention provisions of 1226A. We also know from the legislative history of 1226C that at one time criminal aliens were given the opportunity for bond hearings before immigration judges, and Congress concerned that those aliens, when released on bond by an immigration judge, in large numbers simply did not appear for their removal proceedings. Congress acted by removing that discretionary authority from the executive. Well, how do you deal with our holding in Casas Castrillon that 1226C does not authorize prolonged detention, that after a certain period of time we shift to a review under 1226A? Casas Castrillon, there are several responses to that, Your Honor. Casas Castrillon, number one, arises in the context of a post-order setting. In that case, we had an alien who had filed a petition for review with the Ninth Circuit Court of Appeals and had received a stay preventing that alien's removal pending the outcome of this court's judicial review. The administrative process at the time that the habeas petition was filed had ended, and this court made essentially two determinations. First, the court had to determine which detention statute governed that alien's detention. And this court determined correctly that 1226C governs an alien's detention only as long as removal proceedings are underway. So once those removal proceedings ended and the alien was seeking judicial review before this court and with a concomitant stay of removal, then the alien's detention authority, or I'm sorry, the detention authority over that alien shifts to 1226A. Not as a constitutional matter, but as a simple matter of statutory application. Not even statutory construction, but simple statutory application. So Casas dealt with the detention of an alien for a prolonged period, in that case seven years, under a different statutory scheme. 1226A, which I've noted earlier, is a discretionary detention statute where the alien has an opportunity to seek a bond hearing before an immigration judge. And what the Ninth Circuit said was in that circumstance, where an alien, and specifically a lawful permanent resident, is seeking judicial review of a final order of removal and has received a stay, that alien is entitled to a bond hearing under 1226A. Here we are talking about the pre-order application of 1226C and 1225B. Now, if I can shift to 1225B, Casas does not in any way, shape, or form, address whether or not the government must give an immigration bond hearing to arriving aliens who are seeking entry or admission to the United States. Casas says nothing about that statutory scheme. And with respect to those aliens, Congress has long held, I'm sorry, the Supreme Court has long recognized that aliens who are seeking admission to the United States stand on a decidedly different footing than aliens who have gained entry or admission to the United States. There are foreign consequences for letting aliens who are seeking admission into the United States. There are consequences from that. And it has been, as the Supreme Court has described, a fundamental attribute of national sovereignty for Congress to determine who may and who may not come in. The troubling part of that argument is that some of the people that are detained in the 1225B subclass are returning LPRs. Well, there's absolutely no evidence in the record that there are anybody, there is anybody in the class who is a returning LPR. And as we point out in our briefs, apart from the fact that there's nobody that has been identified falling within the LPR status, LPRs who leave the United States for certain periods of time and return are not considered arriving aliens under current regulations. And we point out those regulations in our brief where the Board of Immigration Appeals has said that the government has to prove, the government has to prove by clear and convincing evidence, that a returning LPR does not fit within one of those six categories. So what we are talking about here and what I believe petitioners acknowledge at least in their motion for summary judgment papers below, which admittedly are not before this court, in substantially every case what we are talking about are arriving aliens who come to this country for the first time and have made a claim for asylum. Are we sure about that? Well, what I am sure of is that there is nothing in the record to indicate that anybody is a lawful permanent resident. But your argument would apply to lawful permanent residents. It would, as would the case law set forth by the Supreme Court. Mazie himself, in Shaughnessy v. Mazie, Mazie was a returning lawful permanent resident who was detained on Ellis Island for a substantial period and was not given admission back into the United States. And the Supreme Court recognized and has consistently recognized that even the prolonged detention of arriving aliens is constitutional because those aliens do not enjoy the same due process rights and in fact enjoy no due process rights with respect to their admission or exclusion. This is a core fundamental and compelling congressional interest and area of congressional authority over arriving aliens. In fact, commentators have noted that at perhaps no other point is Congress's authority over immigration matters at their zenith than when dealing with whether to decide to admit or deny an alien. Such arriving aliens do have an opportunity to gain admission to the United States, not admission, but to be released from detention under the parole authority. And because there is that parole authority, those arriving aliens do have an opportunity to seek release from removal. Or I'm sorry, release from detention. With respect to aliens under Section 1226C, those aliens fit within a particular area of special congressional concern. And the Supreme Court recently in 2003 in Des Moines said that their detention pending their removal proceedings was constitutional because Congress had a legitimate interest in detaining those aliens during that process because in large numbers Congress had shown or had been presented with evidence they simply do not appear for their removal proceedings. And if that statutory purpose was valid at 180 days, that statutory purpose does not change at 181 days. The statutory purpose and congressional intent does not diminish whether an alien is detained for three months, two weeks, seven months, however long it takes for those years. Seven years. Seven years in a post-order context was deemed unacceptable by this Court. And I note that in no circumstance did the Court in Casas say that six months was the limit. But in a pre-order context, the Supreme Court has been clear that detention of certain criminal aliens for the pendency of their removal proceedings, which has a definite termination point, is constitutional. And because of that, the district court's preliminary injunction bypasses, contravenes what the Supreme Court and other courts, including this court, have said with respect to the detention of these two groups of aliens. So the government could essentially, under your reading of the statute, detain these two subclasses indefinitely by just not starting proceedings. Absolutely not, Your Honor. The government does not take the position that any alien can be subject to indefinite detention. And, in fact, the Supreme Court has been clear on that point in Zadvida. Right. But that also, I mean, that also fits within your argument of the post-order, right? Well. Because deportation workers in that case, they could not be removed because there was no country you could remove them to. That's a different constitutional question, because at that point the Supreme Court said the congressional interest, the statutory purpose of securing an alien for the purpose of removal, no longer exists. That is not the case in the context of pre-order detention, where the Supreme Court has said that the legislative and statutory purpose of securing aliens during the pendency of their removal proceedings continues at hand. Does the government recognize the practicality of this situation where, you know, the way these proceedings take place and how many people there are that are being detained, that this does go on for years and years? Your Honor, we understand that as a practical matter, in the vast majority of cases, detention is relatively brief, because removal proceedings in a number of cases, particularly where aliens don't contest their removability, is short. So if they don't contest it, it's brief. But if they're going to contest it, it's long? Well, it's going to be longer simply because they're pursuing a different claim. But the Supreme Court in Damore recognized that that was going to be the case. And in fact, in Damore's case himself, the Supreme Court noted that the length of his detention was caused in part by because he was pursuing certain defenses and because he had requested certain continuances. The rule established by the district court in this case ignores those facts. So if a person has a legitimate basis for arguing that they should be allowed into this country based on derivative citizenship, for example, and they pursue that defense in good faith, the government's position is that's a stronger reason to keep them detained than if they just concede everything and decide to walk away. It's not a stronger reason to keep them detained, but there is a core... It's a justification for keeping them detained, that they're asserting a valid right to be in this country. No, Your Honor. At no point has the government taken the position that because they are pursuing a certain defense, that strengthens the government's interest to keep them detained. The government's interest to keep aliens detained, and we're talking about arriving aliens and we're talking about certain criminal aliens, the government's interest has been recognized by the Supreme Court and in the case of arriving aliens for decades. And that interest does not change during the course of removal proceedings. If there are circumstances in which an alien believes that they have a good constitutional argument that due process requires their release or at least a bond hearing, they should be able to bring that case as a habeas case. But no one-size-fits-all six-month rule comports with due process by applying to every case regardless of circumstances. In that regard, certainly, the district court well overstepped its bounds in contravention of what two other circuits, the Third and Sixth Circuits, have said, is a complete... It's unacceptable because it is too inflexible under the concepts of due process. I see that I have run out of my time. If there are no other questions, then I will sit down. All right. Does anyone else have a question? No. Thank you. Well, I have a question, but maybe counsel could think about it and we could give them an extra minute in rebuttal to comment. All right. I don't understand what the practical problems are for the government. If there are bond hearings after six months, with the government going in and at such a hearing, explaining why an alien should be continued to be detained as opposed to saying there shouldn't be any hearing. I can either answer that question now or, Judge Gould, or if you prefer, I can do it. Let's do it on rebuttal. Thank you, Your Honor. Ahilan Arulananam for the petitioners. May it please the Court. The government has appealed this order to stop its own immigration judges from conducting 15-minute bond hearings for asylum seekers with no criminal history, long-time lawful residents who are eligible for relief from removal, and others, many of whom will win their cases and all of whom by definition have been detained for six months without a bond hearing of any kind. Now, I think given the constitutional avoidance canon, the government has to show, as acknowledged in response to your question, Judge Wardlaw, that Congress explicitly banned bond hearings for people subject to prolonged detention and that these statutes explicitly ban bond hearings regardless of the length of detention. And that argument is completely implausible in light of this Court's decisions, particularly JUF, the second JUF decision, as well as Casas Castrillon and Tijani and Nadaraja, a whole body of cases, Your Honor. JUF imposes the six-month rule for bond hearings as a matter of statutory construction. It cited Casas. It also cited Zidvitas, which authorizes six months, also imposes that as a deadline in a different context, but as a matter of statutory construction. And that's the best reading of what the district court did here. The claims for the two subclasses here, Your Honors, are stronger than the claim in JUF. You know, in fact, Mr. Atkinson and I were here. He argued in this courtroom a few years ago, arguing that because the people in Mr. JUF's situation already have a final order of removal, they've lost their cases and they're trying to get them reopened, they have a weaker liberty interest. And the Court's decision says marginally, you know, that there's some merit to that, but nonetheless concludes that those people, the due process interest that arise from detention after it crosses the six-month threshold, become profound. Now, here are individuals here, Your Honor, none of them have final orders of removal. And, Your Honor, Judge Wardau, you had asked about the possibility of extended removal proceedings. That's not a hypothetical concern. In Nataraja, it's four and a half years, all in the immigration courts. In Tijani, you know, he's at the Court of Appeals at the time the case gets decided, but he goes 20 months in the immigration court and then the Board of Immigration Appeals. And then we have that with some of our named plaintiffs, too, like Mr. Farias, Cornejo. He's 15 months, all in front of the immigration judge. He came here at the age of one, right? He has a drug conviction for which he got a 180-day sentence. It's a possession conviction, right? So it triggers mandatory detention but renders him eligible for relief. And he's taking the time necessary to litigate that case. Now, some of the continuances are because he has to find an attorney. Some of them are because the government is rescheduling the case, right? But overall, it takes 15 months and then he wins. So the question is, why can't at six months, when you know that case, you know, may take longer, why can't a judge just look for 15 minutes and consider whether he is a danger or flight risk or if instead he can be released on bond? Your Honor, I would just also add, there are other examples like this, if the Court is interested in them, of very long detention proceedings, detention during removal proceedings all happening in front of the immigration courts that we're happy to provide if necessary. Well, you're Mr. Atkinson made the point that there's no evidence in the subclass that there are any LPRs. What is your response to that? Well, two responses. We didn't put that evidence in the record because the statute clearly covers LPRs. And we're not riding on a clean slate on this. Nadarajah construed the same statute for an arriving alien, an asylum seeker who had not spent a day in this country except locked in immigration detention, and said, this statute plainly applies to at least some lawfully admitted people, right? In fact, you know, I met a couple of them. I don't think there's a lot of them, but when we were doing post-PI meetings, I met a couple of them. We could provide that information to the Court if the Court was interested in it. There are, in fact, returning lawful permanent residents who are part of this group. In addition, Your Honor, with respect to the question of whether the statute that applies to arriving aliens also applies to people who undisputedly have due process rights, the government already holds bond hearings under this statute for a different class of people, for undocumented people who are found within the United States and then subjected to expedited removal. And that's the BIA's decision in a matter of X, K. And those people are detained under the same statutes, but the government provides bond hearings to them already, and not just prolonged. The government provides those bond hearings in a short period of time, you know, shortly after the people are arrested. So their argument that 1225B authorizes either mandatory detention or explicitly forecloses bond hearings is contrary to their own practice with respect to undocumented people detained under that statute. And also, as Your Honor had earlier said, it can't be reconciled with the fact that returning lawful permanent residents, many of whom are going to go abroad and come back, they're going to have old convictions. By definition, this is the person whose conviction is before October 1st, 1998, because otherwise they would be subject to mandatory detention. But this happens. People have lived their lives. They take a trip. They come back. It's found in a database, an old conviction. And on the basis of that, then, they are locked up, and under the government's interpretation, they can't get a bond hearing. So this we're considering a preliminary injunction appeal. However we decide this, is that the whole case? No, absolutely not, Your Honor. We have filed already for summary judgment. Government's brief is due March 15th. Hearing is set for May 6th. And if the district court resolves any of these issues, then this P.I. is moot once the district court decides the issues. Okay. And my other question is, so he, Judge Hatter, ordered that the bond hearings begin within 30 days of the date of his September 2012 order. Have they been going on? Yes, Your Honor. So a panel of this court, Judge Gould amongst others, granted a 30-day extension for that. And then the hearing started in mid-November, and now the hearings have been happening. And their appearance now is Washington last week. They're happening. They're consistent with the description that we provided in our submission, Your Honor. I wanted to add one other point with respect to lawful permanent residence returning, Your Honor, briefly. Just to commend the court to Landon v. Plasencia, 1982 Supreme Court decision, in particular pages 32 on of that decision, because I think the government is really grossly misreading Landon v. Plasencia. If a returning lawful permanent resident comes back to the U.S., they unquestionably have due process rights. The only time they don't, and Landon holds that, that is the holding of Landon v. Plasencia, is that you can proceed against that person in an exclusion proceeding, because back then the statute had two different kinds of proceedings, but you have to give them due process in that exclusion proceeding. And while it is true that in the 1950s the court had done something different in Mazzei, Landon distinguishes Mazzei because Mr. Mazzei was gone for 20 months. And what they said was that long a departure into Eastern Europe during a wartime was enough to, you know, essentially treat the person as though he were not a returning lawful permanent resident. But the people we're talking about do not fall into that position. There are going to be people who are coming back briefly. There are certainly going to be some such people, and the government is detaining them under the statute, even though they undoubtedly have due process rights. Your Honor, with respect to the government's arguments concerning the interpretation of DeMaury v. Kim, I would just say, you know, Mr. Atkinson talks about this as though we're riding on a clean slate. You know, in this case, the class certification decision in this case, the court said and it described Kim and then said, The detention of an alien beyond an expedited period ceases to be mandatory under 1226C and instead becomes discretionary under 1226A. It then cited Casas and it cited Tijani. You know, in Juif, as I said earlier, it said when detention crosses the six-month threshold, the private interests at stake are profound. And in Juif's discussion, again, they're citing Casas and they're citing Tijani. And those cases have already limited Kim, and they're not the only courts to do it. Other courts have done it as well. You know, the government also suggests that this would be the first time or the district court's the first time to create, you know, such a rule. Well, aside from the fact that this court already did it in Juif, I would also just say, Your Honor, you know, the government's position has been rejected by the other circuit court decisions in this case. Well, Mr. Atkinson argues that the district court decision is in conflict with the Third Circuit and the Sixth Circuit. Right. I want to say a little about that, Your Honor. I don't think it's in conflict with the Third Circuit. You know, we don't read where – obviously, we were amicus in that case. You know, we don't read Dioff as foreclosing the later adoption of a six-month rule on statutory grounds. They didn't do it. We asked them to do it then. They didn't do it. And they said, we're not going to do this. But the holding of the court is that the almost three-year detention, and it was almost three years, all in removal proceedings, was unconstitutional. Okay. And to me, that reminds me, Your Honor, a little bit of Casas. You know, we asked for a six-month rule in Casas, and the court said, this is seven years, and that's not authorized. Right. If the – later, you know, then there were another round of cases that came, you know, floating up. And then the court adopted a six-month rule here. Right. There are a lot of cases in the Third Circuit that are pending because the district courts are all over the place on what this means. You know, and I think it's certainly possible. Nothing in that decision forecloses the later possibility of a court saying, yes, reasonable period, but we think six months is a presumptively reasonable period, or something along those lines, if they see that there's a, you know, a rash of inconsistent decisions coming later. These are all considered civil cases, right? Yes, Your Honor. Because in criminal cases where the government has a more compelling interest, perhaps, in pretrial detention, those people are entitled to a hearing to determine whether or not they're a flight risk or a danger to the community to determine whether they can be released on bail. In a matter of days, Your Honor, in a matter of days. You know, that probable cause hearing has to happen in 48 hours, and in most jurisdictions, they just put them together. So you get that hearing in days. So we're treating, without this injunction, we would be, and maybe this is a question from Mr. Atkinson, treating civil detainees more harshly than we treat criminals who have committed serious crimes. No question about it, Your Honor. And while the court, the Supreme Court upheld, you know, brief mandatory detention in DeMaury v. Kim, there were two critical facts about that, right? One is it's a person who had conceded deportability. And many of our class members are not going to be in that position. Like I said, Mr. Farias, Mr. Rodriguez, these people have won their cases. They were eligible for leave. They won their cases, right? And second, that brief period is specifically defined as 85. In 85% of the cases, it's 47 days. And then in the few remaining ones that go to the board, what Kim says is it's four months. So by definition, we're outside of that time period. So the bigger question is whether the courts can read in a due process kind of provision into legislation that Congress has enacted when Congress hasn't acted to reform that part of the law. Yes, Your Honor, except I would say that that makes it sound a little bit like an open question. We did it in juve. 1231A6 doesn't have any particular time limit in it. And the court read one in. The court didn't advise us. And remember, Congress did explicitly address detentions of six months in the Patriot Act. There's a provision there. It authorizes detention. It speaks exactly to six months. And then it has very high-level review permitting that. So six months didn't come out of thin air. Courts have already done this. And this is just a logical extension of juve and casas and tijani to a class of people who have stronger claims than those people do. Just two other brief things on that subject, Your Honor. Your Honor, the government made reference to the legislative findings that Congress had made back in the mid-'90s or early-'90s, really, about mandatory detention. Those also, if you read those, are all about deportable criminal aliens. That's what Congress is talking about in that legislative history. For whatever it's worth, leaving aside the fact that it's already been construed by this Court, and I don't believe the Court is free to adopt the interpretation that Mr. Atkinson advances, that no matter how long your removal proceedings take, that 1226C authorizes it because you'd have to read against the statement in this case and the statement in casas and tijani and all these other cases. But leaving that aside, we don't think the legislative history authorizes that. The last thing I would say on that subject, casas itself, the procedural history of it is butchered a little bit. And I want to say a little bit about that. At the time that the case was argued and that we briefed it, he was in the Court of Appeals on his petition for review, right? But then he won, and it was remanded, and he was back before the board when the opinion came out. And so at the time that the opinion came out, and they say this, it's discussed in the opinion, he is back in the immigration courts. So how does the government read casas, which says this is 1226A for a person who is in the board and is about to go back to the immigration judge? The only way to read it is to say that casas also is contemplating a time period rule, right? And, yes, it doesn't define what the time period is, but you fix that. And then, you know, the only other thing I would say, Your Honor, I'd like to commend to the Court there's an amicus brief by a set of social science researchers, anthropologists, sociologists, and others, which describes a lot of the harm with respect to detention. Judge Gould, you had asked, what is the harm for the government, right? The government gets its day in court. The government can go and argue. Some of these people are going to get bonds. Some of them are not. The government's going to have ample opportunity. Usually the immigration judge that's going to be doing the case is the same immigration judge who has the merits case. It's the same judge. So if the government says, Oh, no, this person, this person, you can't let them out, the judge is going to know and is going to be able to assess that. All we're asking is for a day in court, the chance to ask for release for a set of people, some of whom surely deserve it. And we think that that result is required by this court's cases, Your Honor. All right. Thank you very much, counsel. Thank you. Mr. Atkinson, we'll give you two minutes. Judge Wardlaw, to answer a question that you raised to Mr. Ariel Amantham, and then I'll respond to Judge Gould's question. Yes, we treat aliens, arriving aliens, criminal aliens differently than we do U.S. citizens who are in pretrial detention because the Supreme Court has said consistently throughout this country's history that citizens, that Congress can make rules with respect to non-citizens, that it cannot make, that would be unacceptable with respect to citizens. And with respect to these two groups of particular non-citizens, the Supreme Court has said that Congress's interest in controlling its borders and in making sure that certain serious criminal aliens appear for the removal proceedings are deserving of and are consistent with due process to receive differing treatment. And so that is the response to that question. Judge Gould asked, what's the practical problem with giving everybody a bond hearing at six months? That's not the appropriate question. Practically, bond hearings are being given at six months within the district under the preliminary injunction. The question is, are those bond hearings compelled by due process? And what's happening? I mean, they're having their bond hearings. How many people are getting released and how many people are going back into detention? There have been approximately 400 bond hearings under the PI, and I believe that something close to two-thirds of those aliens have been released on bond. Because the courts have found no flight risk and no danger to the community? That's correct, which was the same situation in 1996 when aliens were being released on bond after findings of no flight risk and danger, and then later were not showing up for the removal proceedings. And because of that problem, because of that specific problem, the Supreme Court in DeMoore in 2003 said that Congress could, on a categorical basis, without individualized bond hearings, without individualized bond hearings, detain certain criminal aliens during the pendency of their removal proceedings. That's the constitutional underpinnings for why what Congress has authorized with respect to the detention of criminal aliens is constitutional. Counsel, if I could interject a point. I still haven't really heard an answer to my question. I've heard that my question isn't the right question or shouldn't be controlling, but I'm just trying to get to the heart of what is the interest of the government in opposing having hearings. I understand the interest of the government at particular hearings in saying this immigrant should not be released because of danger to community or flight risk, but I'm not quite understanding the interest of the government in opposing letting someone have notice and an opportunity to be heard. Sure. There are two responses because we're dealing with two different groups of aliens, Judge Gould. With response to arriving aliens, aliens who are first coming to our shore, I'm sure Mr. Ari Lamantham would agree that many of the cases that are in the class are people who have come from, say, for example, Somalia. And they come up through Mexico and they present themselves at the border, many of whom have no reliable identification, no residence in the United States. So under their order or under their rule and under the district court's order, what would happen is those aliens would get a bond hearing in six months and many of those aliens would not have criminal history because they haven't been to the United States and the United States has no way to check what their criminal history was in Somalia or Vietnam or Ecuador. Right, but couldn't the IJ take that into consideration in the flight risk decision or the danger to the community factor? Couldn't the IJ take into consideration whether or not he thinks there's a chance they're going to show up for their removal proceedings in the flight risk calculation? Yes, but there are two responses to that. One, the burden is on the government to show flight risk and danger, and the government may not have the ability to show that burden if they do not have the individual's criminal record because it's simply unavailable. But secondly, and this gets to, the practical melds with the congressional interests in this way, Judge Gould, particularly with regard to arriving aliens. The court has long recognized that who we decide to let in or not let in will affect our relationship with foreign nations, and they have, Congress has specifically said that you may release, you may parole certain aliens into the United States if they meet certain standards different from flight risk and danger. So the practical effect of this order is to eviscerate, eviscerate the parole determination process, which is constitutionally correct in being a discretionary system exercised by the executive. That's gone under this order. Now we leave these sensitive national sovereignty issues to immigration judges on factors of flight risk and danger. This order creates a different test applied by different individuals than the Supreme Court has said may be applied now. With respect to criminal aliens, Judge Gould, to respond to your practical question, we don't know at this time how many of the aliens who have been released under this order will simply disappear and go underground. We don't know because it's only been a couple of months since those aliens have been released on by. But Congress has recognized and the Supreme Court has upheld the determination that the concerns that those types of aliens on a categorical basis in large numbers, not in every case, but in large numbers fail to appear for their hearings, is sufficient enough basis to give Congress the authority to deal with that practical problem by mandating detention without bond during the period of removal proceeding. Do you have demographic data or data on what countries the detainees are from, like how many are from Somalia, how many are from Mexico? Yes, there is a – I do not have that information memorized. Do you have it somewhere? Yes, there's a 2011 statistical yearbook that is published by the Department of Homeland Security that has that information broken down by, I believe, region and country. And so I'm well over my time. And unless this Court has no further questions, I just want to summarize by saying, in conclusion, the application of a blanket, one-size-fits-all, six-month rule has been rejected by two other circuits, including the Third Circuit. I believe Mr. Ariel Anantham is incorrect. That court said that the determination of whether an alien may continue to be detained in compliance with due process must be determined on a fact-by-fact basis, on a case-by-case basis, taking into consideration a variety of factual circumstances that this rule does not allow to be considered. Okay. One last question. Are there other subclasses that have yet to be adjudicated in this case? There are two other detentions statutes being challenged, 1226A, aliens who already have a right to a bond hearing. Their position is that even if they get a bond hearing and a judge says they're a flight risk and danger, they've got to get another one at six months and another one six months after that. We've got a variety of arguments why that's well beyond what due process requires. The other category is 1231 detainees. That is essentially the group that has already been addressed by JUF, but petitioners seek to add enhancements or modifications to the bond hearing process with respect to the hearings that they are already entitled to receive. All right. Does anybody else have any further questions? Thank you. No questions here. Thank you. All right. Thank you very much, counsel. Excellent argument. The case will be submitted.
judges: Haddon, Wardlaw, Gould